# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

ASHLEY ZURESS,

        Plaintiff,

   v.                       **Case No. 2:17-cv-866**
                                       **JUDGE GEORGE C. SMITH**
                                       **Magistrate Judge Vascura**

CITY OF NEWARK, *et al.*,

        Defendants.

## OPINION AND ORDER

This matter is before the Court upon Defendants' Motion for Summary Judgment (the "Motion") (Doc. 21). The Motion is fully briefed and ripe for disposition. For the following reasons, the Motion is **GRANTED**.

## I.     BACKGROUND

On March 2, 2016, Defendant Officer David Burris was on patrol and was accompanied by his canine partner, Ike, and Officer April Hunt, who was in field training. (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #128). At the time, the residence located at 48 Willowood Road, in which Brandy Grooms resides, was a known drug house. (*Id.* at PAGEID #121; Doc. 21-1, Ex. E, Initial Incident Report at PAGEID #208). Officer Burris had learned from a confidential informant ("CI") that there was drug activity at the home, which included cars frequently coming and going at odd hours of the night and individuals carrying items out of the house; conduct suggestive of illegal activity. (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #121, 123). Jeff Grooms ("Grooms"), Brandy's brother, was under surveillance as he had an outstanding warrant

for unpaid child support. (*Id.* at PAGEID #124). Officer Burris was generally familiar with Grooms because Grooms had been in and out of jail several times. (*Id.*). Officer Burris learned from his CI that Grooms had been staying at the Willowood home, so the house was also being monitored in an effort to detain Grooms on the outstanding warrant. (*Id.* at PAGEID #125). Additionally, Grooms' sister had informed Officer Burris that Grooms was a drug addict, and Officer Burris had received information from the police department that Grooms was connected to an armed robbery of a gas station. (*Id.* at PAGEID #124–27).

While on patrol on March 2, 2016 Officer Burris' CI informed Burris that a man driving a tan Jeep Renegade arrived at the Willowood residence. (*Id.* at PAGEID #128). Upon receiving this information, Officer Burris and Officer Hunt went to the residence for surveillance purposes. (*Id.*). Officer Burris saw the Jeep leave the residence and began following the vehicle. (*Id.* at PAGEID #129). Shortly thereafter, Officers Burris and Hunt turned on their emergency lights to initiate a traffic stop for failure to properly signal a turn. (*Id.*). After the officers turned the emergency lights on, the Jeep slowed down but passed several locations where it could have stopped. (*Id.* at PAGEID #130). Officer Burris believed this may have indicated the occupant(s) of the car were hiding or ingesting items, such as drugs. (*Id.*). As soon as the Jeep stopped, Grooms jumped from the vehicle and fled on foot. (*Id.*; Video #1)[1]. Officer Burris jumped out of the cruiser and deployed Ike from the car; by the time Officer Burris was out of the car and Ike had joined Officer Burris, Grooms was out of sight. (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #130; Video #1). Officer Burris and Ike did not chase Grooms because they lacked the

---

[1] In support of Defendants' Motion, Defendants manually submitted four videos as Exhibit G to their Motion. (Doc. 21, Ex. G; Doc. 24, Notice of Manual Filing) In support of Plaintiff's Response, Plaintiff manually submitted four videos. (Doc. 29, Notice of Manual in Opposition). The videos submitted by Defendants and Plaintiff are the same videos. Video #1 shows video footage from Officer Burris' and Hunt's police cruiser. Video #2 shows footage from Officer Purtee's police cruiser. Video #3 shows footage from Officer Henry's police cruiser. Video #4 shows footage captured by a bystander. The Court will refer to these exhibits as Videos #1-4.

proper tracking equipment at the time. (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #130–31). During the time Grooms was fleeing, Officer Hunt called for backup. (*Id*. at PAGEID #130).

At this moment, the Jeep, which had been stopped for a total of 19 seconds, began pulling away from the police cruiser by an unknown driver (until this moment Officer Burris did not know there were multiple occupants in the car). (*Id*. at PAGEID #131; Video #1). Officer Burris and Ike returned to the police cruiser, and Officer Hunt, driving, pursued the Jeep. (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #131).[2]

Officers Burris and Hunt followed the Jeep's path and turned onto another street upon seeing the flashing lights of another police cruiser. (*Id*. at PAGEID #135). Officer Jon Purtee had intercepted the Jeep, pulled the Jeep over, and assumed a shooting stance behind the driver's side door of his cruiser. (*Id*.). Officer Purtee commanded Zuress to exit the vehicle, and she did so facing the officers. (*Id*.; Video #2). Officers Burris and Hunt exited their cruiser and assumed covered positions behind Officer Purtee's cruiser. (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #136). For their safety, Officer Purtee commanded Zuress to turn around so she was not facing them. (*Id*. at PAGEID #135–36). Zuress was non-compliant with these orders; Officer Purtee ordered Zuress to "face away" five times before she faced away from the officers. (Video #2). After initially turning around, Zuress continued being non-complaint by twisting, turning around, and looking back at the officers. (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #136; Video #2). Zuress was arguing with Officer Purtee, waving her hands around, and at one point reached down towards her waistband to adjust her shirt. (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #137; Video #2). At this point, Officer Burris instructed Officer Hunt to take

---

[2] Note to Draft: Kurt, at this point, I think it may be best to start citing to the police video that we have instead of the deposition of the officer. Would you agree? If so, how do you recommend citing video?

his spot behind Officer Purtee's passenger side cruiser door, and Officer Burris retrieved Ike from his own cruiser. (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #136).

Once Officer Burris retrieved Ike from the car, Officer Purtee warned Zuress that the dog would be released if she did not cooperate. (*Id*. at PAGEID #147; Video #4). Roughly 1-2 seconds after warning Zuress, Officer Burris released Ike.[3] (*Id*. at PAGEID #137; Video #4). Officer Burris, after releasing Ike, advanced upon Zuress directly behind Ike. (*Id*. at PAGEID #141–42; Video #4). Ike, as he is trained, first jumped into the car to look for additional suspects. (Video #4). When Officer Burris arrived at Zuress he grabbed ahold of one of Zuress' arms. (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #142; Video #4). Almost simultaneously with Officer Burris grabbing Zuress' arm, Ike exited the vehicle and assisted in the apprehension of Zuress by biting and holding Zuress' arm. (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #137; Video #4). During this sequence, Zuress was taken to the ground. (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #143; Video #4).

Once Zuress was on the ground, Officer Hunt and Officer Purtee advanced from their covered positions, and on instruction from Officer Burris, first checked the Jeep for additional passengers. (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #143; Video #4). After it was clear the Jeep contained no additional passengers, Officer Purtee began to assist Officer Burris with controlling Zuress. (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #143; Video #4). Once Officer Purtee was in position to help control Zuress, Officer Burris moved to Ike to release Ike's bite and hold from Zuress' arm. (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #143; Video #4). Once Ike released his bite and hold, Officer Burris moved Ike away from Zuress and

---

[3] The exact time between warning and release of Ike is hard to decipher from the video footage. The scene was filled with Zuress arguing, Officer Purtee shouting commands, and Ike barking. Further, Video #4 has the clearest audio of the videos, and unfortunately, the video focuses on Zuress; Officer Burris is off screen when Ike is released. This makes it hard to tell exactly when Officer Burris released Ike from his grip.

the other officers.  (Doc 21-1, Ex. A, Dep. of David Burris at PAGEID #143; Video #4).   From the moment Officer Burris and Ike approached Zuress to the moment Ike released Zuress, roughly 44 seconds had elapsed.  (Video #4).  From the moment Ike first bit Zuress until the moment Ike released his bite, roughly 40 seconds had elapsed.  (Video #4).

Zuress was then taken to the hospital where she received treatment for her injuries.  Zuress received 17 staples in her arm, and now alleges that she has a permanent scar and suffers from nerve damage.  (Doc. 21-2, Ex. B, Dep. of Ashley Zuress at PAGEID #247).  After Zuress was taken to the hospital, officers searched the Jeep and found a loaded revolver that Grooms had tossed to Zuress before fleeing the vehicle.  (Doc. 21-1, Ex. C, Dep. of John Purtee at PAGEID #325).  Zuress was later charged with two felony counts, failure to follow an order of a police officer and obstructing official business.  Zuress entered a plea bargain when the charges were reduced to misdemeanors.

## II.    STANDARD OF REVIEW

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012).  The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment.  *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). But self-serving affidavits alone are not enough to create an issue of fact sufficient to survive summary judgment. *Johnson v. Washington Cty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013) (Marbley, J.). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson,* 477 U.S. at 251.

## III.   DISCUSSION

Defendants move for summary judgment on the Plaintiff's § 1983 excessive force and state law battery claims against Officer Burris and the municipal liability claims against the City of Newark.

42 U.S.C. § 1983 imposes civil liability on individuals who act under the color of state law and deprive a citizen of their constitutional rights. *See Brousseau v. Haugen*, 543 U.S. 194, 197–

98 (2004). For a plaintiff to state a claim under § 1983 they must show: 1) their constitutional right(s) have been violated, and 2) a person acting under the color of state law caused the violation. *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015). There is no dispute as to the second prong of this analysis—that Officer Burris was acting under the color of state law. However, Defendants do contest the first prong—Zuress' claim that her constitutional rights were violated.

**A.     Officer Burris is Entitled to Qualified Immunity because he did not use Excessive Force to Apprehend Zuress**

Defendants argue that Officer Burris is entitled to qualified immunity because he did not violate Zuress' rights. (Doc. 21, Mot. at 10). They contend that given the totality of the circumstances, it was objectively reasonable for Officer Burris to use Ike to assist in apprehending Zuress. Zuress counters that Officer Burris is not entitled to qualified immunity because he used excessive force in violation of her constitutional rights. She contends that she was, at most, passively resisting arrest, not suspected of a serious crime, and did not pose an immediate safety or flight threat to Officer Burris. (Doc. 28, Resp. at 24–34). Defendants argue that the force they used was objectively reasonable given the circumstances. This Court agrees with Defendants.

Qualified immunity protects government officials acting under the color of state law so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When analyzing a government official's claim of qualified immunity, the Court conducts a two-step analysis: 1) has the plaintiff alleged or shown facts evidencing a violation of a constitutional right, and 2) was the alleged violation of that constitutional right "clearly established" at the time of the incident. *Stanfield v. City of Lima*, 727 F. App'x 841, 845 (6th Cir. 2018) (quoting *Pearson*, 555 U.S. at 232). If a

plaintiff is to defeat a claim of qualified immunity, the court must answer the prior questions in the affirmative. *Stanfield*, 727 F. App'x at 845.

Thus, in evaluating whether qualified immunity protects Officer Burris from Zuress' § 1983 claim of excessive force, this Court must first consider if Officer Burris violated Zuress' constitutional rights. If he did so, only then will this Court determine if those constitutional rights were clearly established at the time of the incident.

The Fourth Amendment governs police officers' use of force during an arrest. *See Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The Fourth Amendment requires that law enforcement's use of force is reasonable. *Graham*, 490 U.S. 386 at 395. The Fourth Amendment authorizes police officers to use force in effecting an arrest, "but the question is . . . whether [officers] could reasonably use the *degree* of force employed against the [suspect]." *Stanfield*, 727 F. App'x at 845 (quoting *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013)). The degree of force inquiry is an objective inquiry that does not utilize the benefit of 20/20 hindsight, but rather, "must be evaluated from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. 386 at 396. Importantly, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* Courts consider "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 397. The extent of the injury is not the central part of the analysis, rather, the key question is whether law enforcement acted with "gratuitous violence." *Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 539 (6th Cir. 2015).

In evaluating a police officer's use of force, courts consider three factors: 1) the severity of the crime, 2) the suspect's immediate threat to the safety of the officers and others, and 3) the suspect's evasion or resistance of arrest. *Graham*, 490 U.S. 386 at 396. With these three factors in mind, a court must then determine "'whether the totality of the circumstances justified a particular sort of seizure.'" *Stanfield*, 727 F. App'x at 846 (quoting *Graham*, 490 U.S. 386 at 396). Because this is a motion for summary judgment, this Court first views the alleged facts in a light most favorable to the non-moving party (here, Zuress); because this case involves qualified immunity, this Court then views the non-moving party's facts as a reasonable officer on the scene would. *Id*. at 845–46.

### 1. Severity of the Crime

The first factor—the severity of the crime—weighs in Officer Burris' favor. Officer Burris and Officer Hunt were performing surveillance on an individual who had an outstanding felony warrant, was known to be active within the illicit drug community, was believed to be connected to an armed robbery, and failed to pull over immediately when the officers initiated a traffic stop. After stopping the Jeep, the individual fled on foot and an unknown driver of the Jeep left the scene of a valid traffic stop. Eventually, Zuress was charged with obstructing official business and failure to comply with police orders.

All of these facts together create a scenario where a reasonable officer would have reason to believe a serious crime could be taking place. Officer Burris suspected that these individuals could have been involved in illicit drug activity, and drug crimes are typically serious crimes. *See Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 729 (5th Cir. 2018) (finding that the severity of the crime weighed in favor of the defendants when the officers were executing a narcotics warrant). Prior evidence of drug activity does not necessarily turn a minor crime into a severe crime. *Saunders v. Cuyahoga Metro. Housing Auth.*, 769 F. App'x 214, 220 (6th Cir. 2019) ("a

previous report of drug activity does not change the analysis because there is nothing in the record suggesting that drug activity occurred"). However, the situation at hand differs because Officer Burris had multiple reasons to suspect that drug activity was presently occurring. First, the Jeep arrived at the Willowood residence and departed a short time later—an action common with drug activity. Second, when the officers initiated a traffic stop the Jeep did not pull over immediately and passed several locations well suited for a stop—an action that is common when individuals are hiding or swallowing contraband. Third, Grooms fled the scene on foot—indicating that he had serious motive to not interact with the police. Fourth, Zuress fled the initial stop in a vehicle—indicating that she had serious motive to not interact with the police. Combining all these factors together, it was reasonable for Officer Burris to suspect that drug activity or some other serious crime was afoot.

Zuress argues that she was simply suspected of, and charged with, the minor crime of "obstructing official business by fleeing from the scene of a lawful traffic stop, a non-violent second degree misdemeanor." (Doc. 28, Resp. at 25). Zuress tries to minimize the severity of the situation by urging this Court to separate Groom's actions from her actions. She argues that "picking the wrong boyfriend is not a crime" and "she was suspected…of committing a non-violent offense: driving her own Jeep away from the scene where her boyfriend was pretextually stopped and fled." (*Id*. at 26).

With the benefit of hindsight, Zuress appears to have a compelling argument. However, Officer Burris did not have the benefit of hindsight during the incident and the degree of force inquiry is an objective inquiry that does not utilize the benefit of 20/20 hindsight, but rather, "must be evaluated from the perspective of a reasonable officer on the scene." *See Graham*, 490 U.S. 386 at 396. All that Officer Burris knew at the time of the incident was that Zuress was traveling

with a known felon who left a known drug house, was connected to an armed robbery, and fled a felony traffic stop after her boyfriend fled from the same felony traffic stop. These facts cannot be ignored. While the first traffic stop was initiated for a failure to signal a turn, the second traffic stop was initiated because Zuress fled from the prior traffic stop. In other words, the situation had escalated greatly after Grooms fled the scene and Zuress drove away. Looking at the entire situation, it was reasonable for Officer Burris to not only suspect Zuress of fleeing the scene, but also drug trafficking and possession of a firearm. For these reasons, the severity of the crimes that Zuress was suspected of weigh in favor of Officer Burris.

### 2. Threat to Officers or Citizens

The second factor—the threat posed to the officers and others—weighs in favor of Officer Burris. Officer Burris claims that "it was objectively reasonable to believe that Ms. Zuress posed a threat to the safety of the officers and citizens." (Doc. 21, Mot. at 15). Whereas Zuress argues that "nothing in [her] acts or failure to act suggested that she was dangerous or likely to flee." (Doc. 28, Resp. at 27). This Court disagrees with Zuress—it was objectively reasonable for an officer to believe that Zuress posed a threat to the safety of the officers or others.

There are several reasons why it would be reasonable for an officer to fear for their safety during the incident. First, Zuress was traveling with an individual who was believed to be involved in drug activity and armed, had just fled on foot, and had a warrant out for his arrest. Second, Zuress herself fled from the scene of a traffic stop, was standing next to an open drivers side door where she could have accessed a weapon or continued her flight, failed to comply with orders to walk backwards towards the officers, and reached for her waistband where a weapon could have been hidden. Third, the environment itself presented a dangerous situation because the officers did not know if there were other occupants in the vehicle (or if any such occupants were armed), did not know if Zuress' flight was a part of a larger plan for Grooms to escape custody, and were

at risk of a potential ambush by Grooms who had fled out of sight earlier. Further, the incident occurred in a residential area where citizens could have been put in harm's way.

*Caldwell v. City of Southfield* is instructive on this issue. In *Caldwell*, the court found it to be objectively reasonable for an officer to fear for his safety when he knew that the suspect had recently been in possession of a firearm during robberies and the suspect exited a stolen vehicle and grabbed his waistband. *Caldwell v. City of Southfield*, No. CV 13-15283, 2015 WL 7016336, at *8 (E.D. Mich. Nov. 12, 2015). The situation at hand is similar. Here, Zuress was traveling with Grooms, whom Officer Burris suspected was armed because he had information that Grooms was connected to an armed robbery. Further, after exiting the Jeep, Zuress did not stand with her back facing the officers and reached towards her waistband. This activity is enough to make a reasonable officer fear for his safety. *See Jackson v. Washtenaw Cty.*, 678 F. App'x 302, 306–07 (6th Cir. 2017) ("While Jackson was in one sense complying with [the officer's] command to stop, his further turning around with his hand by his waist presented itself as an immediate threat to the officer.").

When combining Officer Burris' knowledge of Grooms, Zuress' own actions during the stops, and the dangerous environment the officers found themselves in, it is objectively reasonable for an officer in this situation to have significant fear for his safety or the safety of the citizens in the surrounding area.

### 3. Resisting or Evading Arrest

The third factor—the arrestee's resistance to or evasion from arrest—weighs slightly in favor of Zuress. Defendants argue that Zuress was "actively resisting commands of Officer Purtee and thus not being compliant with the effort to safely arrest her." (Doc. 21, Mot. at 15). Zuress argues that her non-compliance with the officer's commands constitutes passive resistance that makes the use of Ike excessive. (Doc. 28, Resp. at PAGEID #905).

When analyzing the level of force officers use to effectuate an arrest, courts draw a distinction between active and passive resistance. *See Jackson*, 678 F. App'x at 306 (6th Cir. 2017) ("[the Sixth Circuit] has long distinguished active resistance by arrestees from passive resistance. The former can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders. The latter is generally shown by the lack of physical resistance or verbal antagonism.") (internal citations omitted). Generally, active resistance by a suspect will warrant an increase in the use of force, whereas passive resistance does not justify an increase in the use of force. *See Ebie v. City of Pataskala Div. of Police*, No. 2:16-cv-283, WL 3057722 (S.D. Ohio June 20, 2018) (Watson, J.) ("failure to comply with officer orders alone does not constitute active resistance for purposes of the *Graham* analysis.").

In the situation at hand, it is undisputed that Zuress exited the Jeep and failed to comply with orders to turn her back and walk towards the officers backwards. On the other hand, Officer Burris makes no claim that Zuress fought back, pulled away, or otherwise exerted physical force or verbal hostility once she was pulled over the second time. These actions seem to constitute passive resistance. However, it is also true that Zuress had just fled the scene of the first traffic stop. Fleeing from the scene of a traffic stop in a car would certainly constitute an active attempt to evade arrest, and this must be considered when classifying Zuress' resistance as either active or passive. Courts have found that once a suspect stops resisting the arresting officers must act accordingly and cease the use of escalated force. *See Goodwin v. City of Painesville*, 781 F.3d 314, 324 (6th Cir. 2015) (citing *Landis v. Baker*, 297 F. App'x 453, 463 (6th Cir. 2008)) ("previously-resisting suspects have a constitutional right to be free of a gratuitous application of a Taser once they have stopped all resistance"). However, those situations usually involve a suspect who not only stops actively resisting, but completely surrenders. *See Alicea v. Thomas*,

815 F.3d 283, 290 (6th Cir. 2016) (finding that an officer could have acted unreasonably when he "command[ed] a dog to attack a suspect who had ceased flight, was effectively trapped, and who immediately complied with police orders."). Cases like *Alicea* differ from the case at hand, because while Zuress did stop fleeing, she did not fully comply with the officers' orders and was not trapped. To further illustrate this point, the Sixth Circuit has found that even when a suspect raises their hands in surrender after evading arrest, the use of a canine is not necessarily excessive. *Baxter v. Bracey*, 751 F. App'x. 869, 872 (6th Cir. 2018) ("even with Baxter's hands raised, Harris faced a suspect hiding in an unfamiliar location after fleeing from the police who posed an unknown safety risk—all factors the *Campbell* court identified as significant to determining whether the seizure was lawful."); s*ee also Johnson v. Scott*, 576 F.3d 658 (7th Cir. 2009) (finding that although the plaintiff raised his hands and stated "I give up" that a "a reasonable officer could think that the use of the dog was necessary to help control [the plaintiff]; otherwise [the plaintiff] might have had the time he needed to retrieve and use a weapon.").

Here, once Zuress stopped the second time, she stepped out of the car, but she did not surrender by putting her hands up nor did she fully comply with the officer's demands. In fact, as discussed above, she made movements that gave the officers reasonable concern for their safety (*e.g.*, turning around, fidgeting, reaching for her waistband, etc.). Thus, it cannot be said that Zuress completely surrendered such that it would be unreasonable for Officer Burris to think that the use of Ike was excessive.

Therefore, while Zuress was passively resisting arrest by not following the officers' commands, she was also actively evading arrest in the moments before Ike was released. On balance, the active resistance or evading arrest prong probably favors Zuress, but only slightly.

### 4.    Totality of the Circumstances

The three factors discussed above are not exclusive—the Court is to consider those three factors and then determine if the force was objectively reasonable based on the "totality of the circumstances." *See Graham*, 490 U.S. 386 at 396.  In looking at the totality of the circumstances, it was objectively reasonable for Officer Burris to use Ike to help effectuate the arrest of Zuress. Zuress could have been involved in a serious or dangerous crime, Officer Burris' safety could have been at risk, and Zuress had just actively fled a police stop before pulling over and then failing to fully comply with the officers' commands.  Taking into account all the facts, Officer Burris did not violate Zuress' Fourth Amendment right to be free from excessive force.

Zuress argues that the experts she retained in the course of litigation bolster her argument. She claims "experts will persuasively explain to the jury how Defendant Burris misused Ike…" (Doc. 28, Resp. at PAGEID #946).  Defendants claim that the motion for summary judgment is not the proper place to consider such expert testimony because such opinions "go to the ultimate issues of the case, and thus have no place in summary judgment proceedings.  Rather, such opinions are to be used only if the case were to make it to trial, at which time a jury could draw inferences from the testimony."  (Doc. 30, Reply at PAGEID #1062-63).  This Court agrees with the Defendants.

"When the rules speak of an expert's testimony embracing the ultimate issue, the reference must be to stating opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue." *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994).  An expert opinion offered on the objective reasonableness of an officer's use of force is a legal conclusion because "objective reasonableness is the precise legal standard of *Graham* to be used in the qualified immunity inequity. . ." *DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 426 (6th Cir. 2006).

In the case at hand, both of Zuress' experts offer their opinion that Zuress was the subject of excessive force. Zuress admitted as much when she stated "conclusions by both of Zuress' experts that excessive K-9 force was used" and "[t]heir opinions are especially probative because they detail the way in which the officers acted unreasonably on the undisputed facts. . ." (Doc. 28, Resp. at PAGEID #934). Thus, while the expert opinion may be persuasive at trial, the Court is under no obligation to accept the legal conclusions offered by Zuress' experts in determining whether a genuine dispute of material fact exists. *See Carpenter v. City of Franklin*, No. 1:05-cv-323, 2006 WL 3791931 at *13 (S.D. Ohio Dec. 22, 2006) (finding that the expert opinion "fail[ed] to meet the requirement for a factual basis and that the finding of a 'proper' use of force is a conclusory assertion about an ultimate legal issue").

Notwithstanding the foregoing, the expert opinions do not shed any additional light on the undisputed facts in this case and thus, do not help to create a genuine issue of material fact. The Court has video evidence from the incident and Officer Burris offered his state of mind during the incident in his deposition. The expert opinions do not shed new light on the video evidence or Officer Burris' state of mind during the incident. Thus, the expert testimony does not provide any new facts that create a genuine issue of material fact.

Lastly, there is nothing in Zuress' expert's opinions that is particularly persuasive. Expert testimony is often viewed with skepticism. *See Campos v. MTD Products, Inc.*, No. 2-07-0029, 2009 WL 920337 at *2 (M.D. Tenn. April 1, 2009) ("the concern remains that expert witnesses are, in effect, hired guns, who, while educated and experienced in the field, are willing and able to hire themselves out to the highest bidder to provide opinions in favor of the hiring party."). "'An expert can be found to testify to the truth of almost any factual theory, no matter how frivolous, thus validating the case sufficiently to avoid summary judgment and force the matter to trial.'"

*United States v. D.M.*, 942 F. Supp. 2d 327, 335 (E.D.N.Y. 2013) (quoting Jack B. Weinstein, *Improving Expert Testimony*, 20 U. RICH. L. REV. 473, 482 (1986)).  The reality that experts can be hired to say almost anything in support of their client is only reinforced by the fact that the Defendants in this case have hired two of their own experts who come to the opposite conclusion of Zuress' experts.  (Doc. 30, Reply at PAGEID #1063; Doc. 30-1, Ex. A, Expert Report of Ross at PAGEID #1082; Doc. 30-2, Ex. B, Expert Report of Smith at PAGEID #1153.).  Thus, this Court finds that Zuress' expert opinions are not persuasive nor do they create a genuine issue of material fact.

Having found that Officer Burris did not violate Zuress' constitutional rights, the Court does not need to consider whether those rights were "clearly established."  Therefore, Officer Burris is entitled to qualified immunity and the Motion with regards to the excessive force claim against Officer Burris is **GRANTED**.

**B.      Newark cannot be held liable under a Municipal Liability Theory**

Because this Court finds that Officer Burris did not violate Zuress' constitutional rights by using excessive force, the City of Newark cannot be held liable under a municipal liability theory.  *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983.") (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).  However, for the sake of argument, this Court will consider whether Newark could be held liable if Officer Burris had violated Zuress' rights.

The *Monell* decision made clear that local government units could be held liable for § 1983 claims, but that "§ 1983 did not support *respondeat superior* liability, reasoning that 'Congress did not intend municipalities [and other local government units] to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.'"  *Moldowan v.*

*City of Warren*, 578 F.3d 351, 394 (6th Cir. 2009) (quoting *Monell*, 436 U.S. at 691). A plaintiff

can identify one of four methods "[t]o show the existence of a municipal policy or custom leading

to the alleged violation: "(1) the municipality's legislative enactments or official policies; (2)

actions taken by officials with final decision-making authority; (3) a policy of inadequate training

or supervision; or (4) a custom of tolerance of acquiescence of federal violations." *Baynes v.*

*Cleland*, 799 F.3d 600, 621 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1381 (2016) (citing *Thomas v.*

*City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

In the Complaint, Zuress alleges that the City of Newark showed deliberate indifference

to the constitutional rights of its citizens through its "policies, training, supervision and discipline

needed to prevent its police officers and canine units from using excessive force. . . ." (Doc. 1,

Compl. at ¶ 68). Thus, the Complaint indicates that Zuress is alleging 1) the official policies

regarding use of force are unconstitutional, 2) the disciplinary decisions of Newark's final

decision-makers are unconstitutional, and 3) the training program for Newark's officers is

unconstitutional. Zuress does not allege that Newark has a custom of tolerance for federal

violations. However, in Zuress' Response to the Defendant's Motion for Summary Judgment, she

only argues that the official policies of Newark are unconstitutional. (Doc. 28, Resp. at 50–54).

There is no mention of the disciplinary decisions of Newark officials nor is there mention of a

failure to train police officers in the use of force.

When a plaintiff does not address a claim in response to a motion for summary judgment,

the plaintiff is deemed to have abandoned the claim. *See Brown v. VHS of Michigan, Inc.*, 545 F.

App'x 368, 372 (6th Cir. 2013) (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x, 484, 487

(6th Cir. 2011)). Therefore, despite alleging failure to discipline and failure to train, Zuress has

abandoned those claims and Newark would be entitled to summary judgment on those claims even

if Officer Burris had violated Zuress' rights.  The Court will now turn to Zuress' only remaining municipal liability claim—that Newark maintains an unconstitutional policy for its use of canines.

When determining whether a municipality's policy is unconstitutional, the essential question courts ask is: "did the municipality cause the harm or did an individual actor?"  *Morgan v. Fairfield County, Ohio*, 903 F.3d 553, 565 (6th Cir. 2018).  When an act of the municipality itself causes the injury, "fault and causation obviously apply."  *Id*. at 565.  "Likewise, when an injury is caused by the straightforward carrying out of a municipal policy or custom, the determination of causation is easy."  *Id.* at 566.  The Sixth Circuit has established a simple test to determine when a municipal policy is unconstitutional; plaintiffs must "1) identify the municipal policy or custom, 2) connect the policy to the municipality, and 3) show that their particular injuries were incurred due to the execution of that policy."  *Id*. at 566 (citing *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003)).

Zuress claims that Newark's canine policy is unconstitutional because it does not account for the excessive force factors established by *Graham*.  (Doc. 28, Resp. at 52).  Zuress argues that the Newark Police Department "promulgated, disseminated, and applied use of K-9 force policies that neglected or omitted circumstances which distinguish between reasonable and excessive K-9 force."  (*Id*. at 54).  In other words, Zuress' argues that the Newark Police Department's policy is unconstitutional because it does not account for all the constitutional considerations that should be taken into account when officers use escalated force (*e.g*., passive versus active resistance). Newark counters that the use of force policy adopted by the Newark Police meets the constitutional standard because it "sets forth a response to resistance/aggression continuum consistent with established Sixth Circuit law."  (Doc. 30, Reply at PAGEID #1064).  This Court agrees with Newark.

When looking at Section 3.3 and 3.12 of the Newark Policy on Police Service Animals (the "Newark Policy"), it is clear that the policy mirrors the exact factors that *Graham* requires courts to consider. The policy states:

> 3.3.2 Decisions to deploy a canine shall be based on the following:
> 3.3.2.1 The severity of the crime.
> 3.3.2.2 Whether the suspect poses an immediate threat to the safety of the officers or others.
> 3.3.2.3 Whether the suspect is actively resisting or attempting to evade arrest at the time.
> 3.3.2.4 Whether or not the deployment is likely to result in physical apprehension of the suspect.
>
> 3.12 Physical Apprehension of Suspects
> 3.12.1 Canine handlers may use canines to physically apprehend suspects when it is objectively reasonable to believe that:
> 3.12.1.1 The suspect has committed a felony, or a violent misdemeanor as defined by the Division.
> 3.12.1.2 The suspect poses an immediate threat to the safety of the officers or others.
> 3.12.1.3 The suspect is actively resisting or attempting to evade arrest at the time.

(Doc. 21-1, Ex. B, Newark Division of Police General Order at PAGEID #188–89; 194). The sections of the Newark Policy listed above contain the exact same three considerations as the *Graham* test: severity of the crime, threat to the safety of officers or others, and attempts to resist or evade arrest. Zuress claims that the Newark Policy is facially unconstitutional, but this Court cannot see how that is the case. The Newark Policy restates, almost word-for-word, the exact criteria that the *Graham* test uses for the evaluation an officer's use of force.

Further, Section 3.8.1 of the Newark Policy states:

> Use of specially trained police canines for law enforcement responsibilities constitutes a real or implied use of force. In this as in other cases, officers may only use that degree of force that reasonably appears necessary to apprehend or secure a suspect as governed by the Division's use-of-force-policy.

(*Id.* at PAGEID #192).  This also mirrors the constitutional test for excessive force because it commands officers to only use "force that reasonably appears necessary."  This is essentially the same standard as the "objectively reasonable" standard that courts use when determining if an officer's use of force is excessive.

Courts typically find that a municipality's policy is facially unconstitutional when it does not "give any leeway for the officers to consider the constitutional limits that they might face." *See Morgan v. Fairfield Cnty., Ohio*, 903 F.3d 553, 566 (6th Cir. 2018) (finding that a municipality's policy on police "knock and talk" interactions violated the Fourth Amendment because the policy did not give "weight to the core value of the Fourth Amendment").  The same cannot be said here.  In fact, the opposite can be said here—the Newark Policy completely relies on the Fourth Amendment's excessive force core values.

Thus, while Zuress can identify the municipal policy or custom at issue and can connect the policy to the municipality, Zuress cannot show that any violation of her constitutional rights occurred due to the execution of Newark's Policy.  If there was a violation of Zuress' constitutional rights, it would be because Officer Burris did not act reasonably in assessing the severity of the crime, the threat posed by Zuress, and Zuress' resistance or evasion of arrest.  In other words, Newark's Policy would not have caused the constitutional violation, but rather, Officer Burris' misapplication of the policy would have caused the constitutional violation.  Therefore, even if Zuress' constitutional rights had been violated, Newark's Policy would not be facially unconstitutional, and Newark could not be liable.

**C.     Zuress has Abandoned the State Law Battery Claim against Officer Burris**

This Court now turns to Zuress' state law battery claim against Officer Burris.  Under Ohio law, "[i]f an officer uses more force than is necessary to make an arrest and protect himself from injury, he is liable for assault and battery."  *D'Agastino v. City of Warren*, 75 F. App'x 990, 995

(6th Cir. 2003) (ellipsis omitted) (quoting *City of Cincinnati v. Nelson*, No. C-74321, 1975 WL 181750, at *2, 1975 Ohio App. Lexis 7443, at *5 (Ohio Ct. App. May 5, 1975)). Defendants argue that the applicable statute of limitations, found in Ohio Revised Code Section 2305.111(B), bars the state battery claim. (Doc. 21, Mot. at 19).[4] In the alternative, Officer Burris argues that he is protected by Ohio's immunity statute. *See* Ohio Revised Code Section 2744.02.

It is not necessary for this Court to address the merits of Officer Burris' argument because Zurress concedes that the statute of limitations bars the claim. (Doc. 28, Resp. at 54–55) ("Zurress concedes that she has not been able to compile evidence creating a genuine issue of material fact on her compliance with R.C. 2305.11(B) [sic]. . . Defendants are correct under the prevailing precedent that she 'could have discovered' Defendant Burris' identity before one year had lapsed.").

Therefore, this Court deems Zurress to have abandoned her state law battery claims against Officer Burris and the Motion with regards to the Ohio state law battery claim is **GRANTED**.

---

[4] The Ohio statute of limitations for battery states:

> Except as provided in section 2305.115 of the Revised Code and subject to division (C) of this section, an action for assault or battery shall be brought within one year after the cause of the action accrues. For purposes of this section, a cause of action for assault or battery accrues upon the later of the following:
> (1) The date on which the alleged assault or battery occurred;
> (2) If the plaintiff did not know the identity of the person who allegedly committed the assault or battery on the date on which it allegedly occurred, the earlier of the following dates:
> > (a) The date on which the plaintiff learns the identity of that person;
> > (b) The date on which, by the exercise of reasonable diligence, the plaintiff should have learned the identity of that person.

Ohio Revised Code Section 2305.111(B).

## IV.    CONCLUSION

For the foregoing reasons, the Motion is **GRANTED**.  The Clerk shall remove Document 21 from the Court's pending motions list.  The Clerk shall enter final judgment in favor of Defendants and **REMOVE** this case from the Court's pending cases list.

**IT IS SO ORDERED.**

_/s/ George C. Smith_
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**